## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| ALBERTO TORRES | : | No. 10-104-2 |
| | : | |
| | : | |

## MEMORANDUM

PRATTER, J.                                                    OCTOBER _____, 2020

Alberto Torres seeks immediate release from incarceration by moving for a reduction of his sentence under 18 U.S.C. § 3582(c)(1)(A)(i). This is Mr. Torres's such second motion. The primary basis for his motion is the COVID-19 pandemic and attendant conditions relating to the pandemic as they may affect Mr. Torres, who is a former smoker. The Government disputes the merits of the motion. For the reasons that follow, the Court denies the motion.

### BACKGROUND

#### I.      Mr. Torres's Criminal Conduct

Mr. Torres and a co-conspirator, Mr. Duran, were identified by a cooperating drug dealer ("CI") as drug "runners" who transported cocaine from California between 2007 and 2009. Mr. Torres became the CI's point of contact in Philadelphia and supplied kilogram quantities of cocaine to the CI from Mr. Torres's Delaware apartment. The cooperator informed law enforcement that Mr. Torres and Mr. Duran delivered between 150-200 kilograms between the spring of 2007 and January 2009.

Law enforcement personnel then directed the cooperating drug dealer to introduce Mr. Torres and Mr. Duran to a paid FBI cooperating witness. Between November 2009 and January 2010, the FBI gathered approximately 22 consensually recorded calls in which the

1

cooperating witness sought to elicit an offer from Mr. Duran to sell cocaine. Mr. Duran and Mr. Torres met with the cooperating witness and an undercover FBI agent on three separate occasions to arrange a sale of cocaine. In January 2010, after flying to Philadelphia and distributing 24 "bricks" of cocaine to the cooperating witness and undercover agent, Mr. Torres was arrested along with Mr. Duran and a third individual.

Mr. Torres admitted to delivering approximately ten loads of cocaine within a one- to two-year period, including the delivery to the cooperating drug dealer. Mr. Torres also consented to a search of his Delaware apartment, from which agents recovered a loaded gun and ammunition. In February 2010, a federal grand jury returned a three-count indictment, charging Mr. Torres with conspiracy to distribute five kilograms of cocaine and distribution of five or more kilograms of cocaine, all in violation of 21 U.S.C. §§ 846, 841(a)(1). Mr. Torres pled guilty and was sentenced to a 180-month sentence to be followed by five years of supervised release.

Mr. Torres is serving his sentence at FPC Yankton in South Dakota with an anticipated release date of June 26, 2022. He has served approximately 127 months and has earned nearly 12 months credit for good conduct. Mr. Torres thus is credited with served about 139 months of his 180-month sentence. He incurred four disciplinary sanctions, all in 2017, including possession of a hazardous tool on two occasions, refusing work assignment and entry into an unauthorized area, and refusing to obey an order.

## II.    Mr. Torres's Request for Compassionate Release and Medical Records

The Court docketed Mr. Torres's first *pro se* emergency motion requesting compassionate release on May 4, 2020. Doc. No. 138. In that motion, he did not cite any underlying medical conditions which put him at heightened risk should he contract COVID-19. Instead, Mr. Torres stated that the facility in which he is detained does not provide for adequate social distancing and

2

is near a "hot spot" in South Dakota. But the fundamental impediment to Mr. Torres's first motion was his assertion that was he was not required to pursue administrative relief before filing his motion with the Court. The Court denied the motion because Mr. Torres had not exhausted his administrative remedies as required under 18 U.S.C. § 3582(c)(1)(A)(i).  Doc. No. 146.

Mr. Torres has again sought compassionate release—this time by first requesting it from the warden of the facility where he is confined. On June 25, 2020, the warden denied Mr. Torres's request for compassionate release on the grounds that Mr. Torres does not have a COVID-19 risk factor per Centers for Disease Control and Prevention ("CDC") guidelines. About a week later, Mr. Torres filed this motion. In his motion, Mr. Torres seeks relief based on his history as a former smoker and his rehabilitative efforts while incarcerated.

Mr. Torres's medical records for the past three years reveal that he has had and has no medical conditions requiring treatment and is not prescribed any medication. There is no record of any history as a smoker and no record of complaints due to prior smoking. Mr. Torres is reportedly fully ambulatory and engages in all normal activities of daily living within the prison.

**III.    BOP's Response to the COVID-19 Pandemic**

Because "maintaining safety and security of [BOP] institutions is [BOP's] highest priority",[1] BOP has taken significant measures to protect the health of the inmates in its charge. BOP's Pandemic Influenza Plan has been in place since 2012.  BOP HEALTH SERVICES DIVISION, *Pandemic Influenza Plan-Module 1: Surveillance and Infection Control* (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited Oct. 1, 2020). The protocol established a phased framework which requires BOP facilities to begin preparations in the face of a "[s]uspected human outbreak overseas." *Id.* at i. This plan further addresses social

---

[1]    BOP, *Updates to BOP COVID-19 Action Plan: Inmate Movement* (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last visited Oct. 1, 2020).

3

distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates. BOP began planning for potential transmissions related to COVID-19 as early as January, during the same time in which it established a working group to develop COVID-19 policies. In accordance with the Coronavirus (COVID-19) Action Plan, BOP began to modify its operations to minimize the risk of COVID-19 transmissions on March 13, 2020.

Presently, BOP operations are governed by Phase Nine of the Action Plan. Memorandum from the Bureau of Prisons on Coronavirus (COVID-19) Phase Nine Action Plan (Aug. 5, 2020), available at https://cic.dc.gov/release/summary-bop-phase-9-covid-action-plan (last visited Oct. 1, 2020). The current modified operations plan in this phase requires all inmates in every BOP institution to be secured in their assigned cells or quarters to stop any spread of the disease. Only limited group gathering is permitted, with attention to social distancing efforts to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. BOP has limited the movement of inmates and detainees among its facilities. Moreover, official staff travel has been cancelled, as has most staff training. BOP is also endeavoring to regularly issue face masks to all staff and inmates and strongly encourages individuals to wear appropriate face coverings when in public areas if social distancing cannot be achieved.

Phase Nine provides for a gradual resumption of residential programming at a reduced capacity, with social distancing measures, and transfers of inmates between institutions and to and from court. Institutions with active COVID-19 cases may make exceptions to programming requirements for the safety of staff and inmates. Legal visits will be permitted on a case-by-case basis and in-person legal visits should be socially distanced or separated by plexiglass. Social visits were just reinstated as of September 30, 2020, and will be non-contact with social distancing enforced.

4

Inmates who travel outside of the institution, such as for court appearances, should be quarantined upon their return. Newly admitted inmates are screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates are placed in quarantine for at least 14 days or until cleared by medical staff. Symptomatic inmates are placed in medical isolation until they test negative for COVID-19 or are cleared by medical staff as meeting the CDC criteria for release from isolation. The Program Review Division will conduct unannounced site visits to ensure compliance with Health Services Division and the CDC's guidance.

As directed by the Attorney General, BOP is also prioritizing the use of statutory authority to place eligible prisoners in home confinement.[2] Pursuant to the Coronavirus Aid, Relief, and Economic Security Act, BOP may also "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" in the event the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136 § 12003(b)(2). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that have seen the greatest incidence of coronavirus transmission thus far.

Taken together, these measures are designed to mitigate the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices accordingly to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders. Thus far, BOP's efforts at FPC Yankton have been successful. There have been no positive cases of COVID-19 among the 346 inmates in the past six months.

---

[2]     This authority includes the ability to place an inmate in home confinement during the last six months or the remaining 10% of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and to move elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement.

5

## LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007). A defendant can move to reduce his or her term of imprisonment under 18 U.S.C. § 3582(c)(1)(A). In order to do so, the defendant must first request that the BOP file a motion on his or her behalf, which can only occur after he or she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A).[3]

In the event the moving defendant complies with the exhaustion requirement, a court may reduce his or her term of imprisonment if it finds that extraordinary and compelling reasons warrant such a reduction, that the reduction is consistent with the Sentencing Commission's applicable policy statements,[4] but only after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable. Pursuant to the Sentencing Commission's relevant policy statement, a court must also find that the defendant is not a danger to the safety of any person or the community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13.2.

---

[3]     Because the Court is satisfied that Mr. Torres's second motion has met the exhaustion requirement and because the Government does not raise an exhaustion argument, the Court need not focus on this requirement.

[4]     Despite § 3582(c)(1)(A) mandating that a reduction in sentence be "consistent with applicable policy statements issued by the Sentencing Commission," "the policy statement is now clearly outdated" in light of the Sentencing Commission's failure to update its policy statement to account for the changes imposed in light of the amendment to § 3582(c)(1)(A) by the First Step Act of 2018. *United States v. Rodriguez*, No. 03-271, 451 F. Supp. 3d 392, 397 (E.D. Pa. Apr. 1, 2020). Therefore, although the policy statement undoubtedly provides helpful guidance, it "does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *Id.* at *4.

6

Although Congress has not defined the term "extraordinary and compelling," the Sentencing Commission has issued an application note to its relevant policy statement which provides guidance for defining the conjunctive term. Application Note 1 provides, in pertinent part, that a defendant's non-terminal illness may constitute an extraordinary and compelling justification where "the defendant is suffering from a serious physical or medical condition…that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13. In order to find compelling and extraordinary reasons, the policy statement additionally requires a court to find that a defendant is "not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

A court considers multiple factors under 18 U.S.C. § 3553(a), including, among other things, (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to protect the public from further crimes of the defendant"; (3) "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct"; and (4) "the need for the sentenced imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The defendant bears the burden of showing that a reduction in sentence is proper. *United States v. Rengifo*, No. 13-131, 2020 WL 4206146, at *2 (M.D. Pa. July 22, 2020) (citing *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016)); *see also United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

## DISCUSSION

Without a doubt, all segments of our society have been experiencing the unprecedented magnitude of the COVID-19 pandemic. Indeed, to the extent correctional facilities may have successfully dealt with past viruses and outbreaks of communicable diseases, those diseases pale

in scope with the apparent magnitude and speed of transmission of COVID-19 and the challenges associated with it. This virus comes in the form of a world-wide pandemic, resulting in a declaration of a national emergency and states of emergency by many states, along with various forms of business closures or modifications to operations and stay-at-home orders. Without known effective treatment at this time, and vaccines months (or more) away, public health officials urge people to practice "social distancing",[5] frequent and thorough hand-washing, avoidance of close contact with others, and wearing masks during public interactions—all of which are understandably difficult to implement in a correctional or detention facility. The Court takes this critical health risk seriously. But as concerning as the common calamity of COVID-19 is, resolving Mr. Torres's motion still calls upon the Court to take into serious consideration the limits imposed pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

Mr. Torres argues that he should be immediately released under 18 U.S.C. § 3582(c)(1)(A)(i) given his fear of contracting COVID as a Hispanic male, his history as a former smoker, and his rehabilitative efforts.

To be clear, the mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune individual, does not provide a basis for a sentence reduction on its own. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (holding that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread"); *see also United States v. Roeder*, 807 F. App'x 157, 161 n.16 (3d Cir. 2020) (per curiam) ("[T]he existence of some health risk to

---

[5]     Some have understandably suggested that this would be better thought of as "physical distancing", insofar as it is also strongly urged that maintenance of social interaction remains important for purposes of counteracting the negative emotional aspects of isolation.

every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit.").

The Government contends that Mr. Torres's concern that he might contract COVID-19 in a prison environment does not present extraordinary and compelling reasons justifying a reduction in his sentence. The Court must agree.

As demonstrated by his medical records, there is no evidence that Mr. Torres, who is 34 years old, suffers from a condition that is considered "high-risk." Instead, the CDC has stated that being a former smoker "might" present a risk. Courts have routinely denied compassionate release based on similar claims brought by defendants in higher risk age cohorts. *See, e.g.*, *United States v. Buckman*, 2020 WL 4201509 (E.D. Pa July 22, 2020) (denying release where there was no evidence of compromised immune system in 41-year old defendant with a smoking habit); *United States v. Mathe*, 2020 WL 3542177 (E.D. Pa. June 30, 2020) (denying compassionate release where 48-year old defendant had a history of smoking without a secondary diagnosis). In the absence of a demonstrated health concern and diagnosed medical condition, the Court finds that Mr. Torres's assertion that he is a former smoker does not present an extraordinary and compelling justification for his compassionate release.

Nor is it clear that being Hispanic increases Mr. Torres's risk of contracting COVID-19 while he is incarcerated and has access to medical treatment at the facility. To the extent that racial and ethnic minorities have disproportionately contracted COVID-19 and are overrepresented in hospitalizations and deaths, there is no evidence presented here that the reported statistical differences are based on a biological predisposition rather than possibly attributable to systemic economic and social issues. *United States v. Alexander*, 2020 WL 2507778, at *4 (D.N.J. May 15, 2020) ("[I]t is not clear that being African-American increases Defendant's risk of complications

9

from [] COVID-19...."); Center for Disease Control and Prevention, *Coronavirus Disease 2019 Racial & Ethnic Minority Groups*, https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fracial-ethnic-minorities.html (last visited Oct. 1, 2020). Mr. Torres's Hispanic roots are not a medical condition that warrants compassionate release. *United States v. Mark*, 2020 WL 5801495, at *2 (E.D. Pa. Sept. 29, 2020).

Mr. Torres also bases his motion on his efforts at rehabilitation while incarcerated. Congress has explicitly stated that "rehabilitation of the defendant alone" is insufficient for compassionate release. 28 U.S.C. § 994(t). Mr. Torres writes that he has received his GED and has an apprenticeship. He submitted copies of classes in which he has enrolled and completed. The Court recognizes and unreservedly applauds his efforts. But, because Mr. Torres does not present a medical ailment which would warrant release, the Court cannot grant relief based on Mr. Torres's rehabilitation.

Because Mr. Torres has failed to present any extraordinary and compelling justification for his compassionate release and is being held at a facility that has yet to record a single COVID-19 positive case, it is not necessary for the Court to advance to the next step of the § 3582(c)(1)(A)(i) inquiry by assessing the application of the § 3553(a) factors and possible danger to the community imposed.

## CONCLUSION

For the foregoing reasons, the Court denies Mr. Torres's motion for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A)(i).  An appropriate order follows.

**BY THE COURT:**

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**

11